RECEIVED

AUG 2 9 2005

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE-OPELOUSAS DIVISION

| | |
|---|---|
| MARTHA C. BARRILLEAUX | CIVIL ACTION NO. 04-1759 |
| VS. | JUDGE MELANÇON |
| COMMISSIONER OF SOCIAL SECURITY | MAGISTRATE JUDGE METHVIN |

## REPORT AND RECOMMENDATION

Before the court is an appeal of the Commissioner's unfavorable disability finding. Considering the administrative record, the briefs of the parties and the applicable law, it is recommended that the Commissioner's decision be **REVERSED AND REMANDED**.

### *Background*

Born on November 8, 1940, Martha C. Barrilleaux ("Barrilleaux") is a 64-year-old claimant with a high school education and some college credit. (Tr. 313). Barrilleaux has worked in the past as a car valet (parking attendant), card dealer, hospital admissions clerk, and airline reservation clerk. (Tr. 21).

Barrilleaux filed applications for disability insurance benefits and supplemental security income benefits on March 6, 2002 and December 15, 2002, respectively, alleging disability as of November 16, 2000 due to a bad disc in her back, a hand injury, and pain. Her applications were denied initially and on reconsideration, and an administrative hearing was held on November 3, 2003. In an opinion dated March 12, 2004, the ALJ found that Barrilleaux retains the residual functional capacity to perform a significant range of light work. (Tr. 21). The Appeals Council denied review, (Tr. 10-12), making the ALJ's decision the final decision of the Commissioner from which Barrilleaux now appeals.

### *Assignment of Errors*

Barrilleaux raises two errors on appeal: (1) The ALJ erred in assessing her past relevant work and in concluding that she has the residual functional capacity to engage in her past relevant work; and (2) the ALJ erred in concluding that she has no severe mental impairment.

### *Standard of Review*

The court's review is restricted under 42 U.S.C. §405(g) to two inquiries: (1) whether the Commissioner's decision is supported by substantial evidence in the record; and (2) whether the decision comports with relevant legal standards. Carey v. Apfel, 230 F.3d 131, 136 (5th Cir. 2000); Anthony v. Sullivan, 954 F.2d 289, 292 (5th Cir.1992); Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Carey, 230 F.3d at 136; Anthony, 954 F.2d at 292; Carrier v. Sullivan, 944 F.2d 243, 245 (5th Cir. 1991). The court may not reweigh the evidence in the record, nor substitute its judgment for that of the Commissioner, even if the preponderance of the evidence does not support the Commissioner's conclusion. Carey, 230 F.3d at 136; Johnson v. Bowen , 864 F.2d 340, 343 (5th Cir.1988). A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the decision. Johnson, 864 F.2d at 343.

### *Analysis*

In determining whether a claimant is capable of performing substantial gainful activity, the Secretary uses a five-step sequential procedure set forth in 20 C.F.R. §404.1520(b)-(f) (1992):

1.     If a person is engaged in substantial gainful activity, he will not be found disabled regardless of the medical findings.

2.   A person who does not have a "severe impairment" will not be found to be disabled.

3.   A person who meets the criteria in the list of impairments in Appendix 1 of the regulations will be considered disabled without consideration of vocational factors.

4.   If a person can still perform his past work, he is not disabled.

5.   If a person's impairment prevents him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed.

In the instant case, the ALJ determined at Step 5 that, although Barrilleaux suffers from the severe impairment of degenerative disc disease at L5-S1 and status-post open reduction and arthrodesis of the right thumb, she is not disabled because she retains the residual functional capacity to perform a significant range of light work, including her past relevant work.  (Tr. 20-21).

After careful consideration of the record, the undersigned concludes that the ALJ's decision is not supported by substantial evidence.

A.   **Medical History**

**_Back Pain and Arthritis in Right Thumb_**

On November 16, 2000, Barrilleaux injured her back and right thumb in a workplace accident.  Barrilleaux had just arrived at the casino where she worked as a card dealer, when, attempting to step around a puddle, her right leg slipped out from under her, causing her to fall face down, cracking several teeth, and injuring her back, right shoulder, right thumb, and right

knee. (Tr. 129-30, 181). Barrilleaux has reported constant pain since that time, particularly in her back and right thumb and wrist.[1]

On December 13, 2000, Barrilleaux went to the Lafayette Bone and Joint Clinic for an evaluation. Dr. John E. Cobb, an orthopedic surgeon, stated that although Barrilleaux reported back pain, she had no spasms and a normal range of motion. He reported that, neurologically, she demonstrated normal sensory and motor function, and straight leg raises were negative. Furthermore, although Barrilleaux complained of pain in her right thumb, she had no significant swelling or ligamentous instability. (Tr. 132). An MRI of the lumbar spine dated February 13, 2001 showed a small central disc bulge at the L4-5 level and early desiccative changes at the L4-5 disc and L5-S1 levels. (Tr. 133). Following the MRI, Dr. Cobb recommended discography targeting L4-5 and L5-S1. He also noted that Barrilleaux had "fairly significant arthritis of the carpometacarpal [CMC] joint." (Tr. 125).

On March 22, 2001, Barrilleaux was examined by Dr. Douglas Bernard at the Iberia Orthopedic Group in New Iberia, Louisiana. Upon examination of Barrilleaux's lower back, Dr. Bernard reported that she had no spasms, full flexion and extension, normal range of motion, negative straight leg raising tests bilaterally, normal knee jerk tests, normal motor testing, and normal sensory testing. (Tr. 196). Dr. Bernard further stated:

---

[1] The record shows that, prior to her November 2000 accident, Barrilleaux had a previous workplace injury involving her left thumb while working a gaming device, which resulted in subluxation of the thumb. (Tr. 206). On July 8, 1998, Barrilleaux underwent surgery on her left thumb, which required placing pins in the thumb. (Id.). The record shows that Barrilleaux underwent a course of physical therapy on her right hand, which allowed her to regain maximum range of motion and grip strength in her left hand. (Tr. 212-14, 223). On July 8, 1999, Barrilleaux's treating physician, Dr. William Andre Cenac, an orthopedic surgeon, released her back to her regular activity work level – dealer/gamer at a casino – with no restrictions, stating that she had reached maximum medical improvement. (Tr. 217).

> We reviewed an MRI scan that the patient brought with her, and she has mild
> degenerative disc disease at L4-5 and L5-S1, which is not at all unexpected for her
> age. There is no significant disc space narrowing. There is no evidence of any
> significant herniation or bulging. There is no canal or foraminal narrowing. This
> is a very benign situation with degenerative disc disease at L4-5 and L5-S1.

(Tr. 196). Dr. Bernard recommended no treatment for Barrilleaux's back, stating that she was

not a candidate for a fusion. (Tr. 196-97). With respect to Barrilleaux's right hand and wrist, Dr.

Bernard reported that x-rays showed that she had CMC arthritis with complete joint space

collapse of the CMC joint of the right thumb. All other joints about the wrist, digits, and thumb

were normal. (Id.).

An independent medical evaluation was performed by Dr. Randall D. Lea, an orthopedist,

on June 21, 2001, apparently to address the conflicting opinions of Dr. Cobb, who recommended

a discography for Barrilleaux, and Dr. Bernard, who recommended no treatment for Barrilleaux's

back pain. Dr. Lea reported that Barrilleaux had maximum tenderness in the right sacroiliac joint

and right posterior superior iliac spine. (Tr. 185). He further reported negative straight leg

raising tests in the sitting position with a minimally positive straight leg raise on the right and left

lower extremities at 60 degrees of hip flexion, which he attributed to hamstring tightness rather

than being a truly positive test. (Tr. 186). X-rays of the lumbar spine showed five unripped

vertebrae with degenerative changes seen throughout the lumbar spine, with Grade I

spondylothisthesis at the lumbosacral junction with slight retrolisthesis of L3 on 4. (Tr. 188).

With respect to Barrilleaux's right hand, Dr. Lea reported that she had marked tenderness along

the volar aspect of the thumb. Manual muscle testing was intact with the exception of the thumb

CMC abduction/adduction and opposition, which was limited secondary to discomfort. X-rays

of the right thumb showed a degenerative subluxation at the CMC joint with degenerative

changes along the trapezium and trapezial spurs. (Tr. 188).

After considering all of the medical evidence, Dr. Lea stated that he did not agree with

Dr. Cobb that Barrilleaux needs a discography, or any surgical intervention for that matter:

> In my opinion, I do not think surgery is likely to help this individual as her
> findings are not that remarkable on physical exam or MRI and furthermore, I
> believe her pain generator in all probability is mulitifocal, making specific
> procedures difficult to recommend. In other words, I do not think this individual
> is a surgical candidate nor do I think she is a candidate for any type of discography
> at this point.
>
> Conservative treatment measures have ben offered, yet she still has some persistence of
> pain. I do believe that some additional medications can be tried. Specifically, I would
> consider either Neurontin or Elavil . . . .If that does not help, then perhaps Flexeril . . .
> Other than these medications and a home exercise program, I would not recommend
> much additionally in terms of treatment. I do not think she is a particularly good
> candidate for injection therapy nor aggressive surgical procedures.

(Tr. 190). With respect to Barrilleaux's right thumb, Dr. Lea opined that Barrilleaux had to

decide whether to "live with the amount of discomfort she is having or consider thumb CMC

fusion or arthroplasty," noting that surgery "may well be necessary." (Id.).

With respect to her capacity for work, Dr. Lea stated his belief that Barrilleaux was

prevented from returning to her previous job as a card dealer, "more because of her hand than her

back," to wit:

> In other words if her hand complaints were corrected, then I do believe she would
> be able to return to her previous job. Please note, this does not mean that I do not
> think she has pain in her back because I believe she does, yet at the same time I do
> believe it should be at a level where she should be able to stand, sit, or walk with
> moderately good success. I would anticipate that between three and four months
> postop she should be able to return to her previous job as a dealer."

(Tr. 191).

Barrilleaux underwent surgery for arthritis in her right thumb on December 11, 2001,
which involved inserting a pin in her first metacarpal bone in the right hand. (Tr. 143). On
December 19, 2001, Barrilleaux's stitches were removed and her right hand was placed in a cast.
(Tr. 123). On December 26, 2001, Barrilleaux failed to show up for her scheduled appointment,
(Tr. 122), but on January 9, 2002, she was evaluated again by Dr. Cobb. Dr. Cobb reported that
the fusion looked good and he removed Barrilleaux's cast. Because Barrilleaux continued to
complain of pain, Dr. Cobb prescribed painkillers. (Tr. 120). On January 10, 2002, Barrilleaux
contacted Dr. Cobb's office, complaining of severe back pain and requesting an appointment.
(Tr. 119). On February 20, 2002, Dr. Cobb reported that because Barrilleaux continued to
complain of pain and numbness in her right thumb, he put her right thumb in a thumb spica and
advised her to return in six weeks.. (Tr.1 115). The following day, Barrilleaux was examined by
Dr. Daniel Hodges, also with the Lafayette Bone and Joint Clinic, for back pain and placed on
painkillers. (Tr. 113).

At the request of Disability Determinations Services, Barrilleaux was examined by Dr.
Harold A. Heitkamp, a general surgeon, on September 6, 2002. Dr. Heitkamp diagnosed
Barrilleaux with mild degenerative disc disease at the L5-S1 level, with very mild radiculopathy
in the right lower extremity. (Tr. 153). He further reported that Barrilleaux has marked
weakness in her right hand secondary to the pinning of her first metacarpal bone in the right
hand. (Tr. 153). Dr. Heitkamp reported that, orthopedically, Barrilleaux is limited from using
her right hand for any type of grip or strength, because although she has most of her dexterity in
her hand, she has minimal strength. He stated that she is further limited by her lumbar sacral

spine from any squatting, crawling, creeping, frequent bending, and climbing ladders. He stated

that she cannot lift anything over 20 pounds except on an occasional basis. (Tr. 154).

### *Depression*

Barrilleaux has been treated for depression by her internist, Dr. Roland J. Degeyter, who

prescribed Paxil, 30 mg. daily. Dr. Degeyter reported his belief that Barrileaux's depression is

related to her chronic pain. (Tr. 150).

On December 3, 2001, approximately one week before her thumb surgery, Barrilleaux

was examined by Dr. F.T. Friedberg, a clinical psychologist, apparently at the request of Dr.

Degeyter. Dr. Friedberg reported that Barrilleuax appeared to be undergoing a "major

depression" that was "in direct relation to the accident and the onset of pain since that time." (Tr.

149). Dr. Friedberg further stated that it did not appear that Barrilleaux was exaggerating her

symptoms, and he stated his belief that she needed individual supportive counseling. (Id.). He

noted that she was currently being prescribed 30 mg. of Paxil per day by Dr. Degeyter. (Tr. 148).

On December 17, 2001, approximately one week after her thumb surgery, Dr. Friedberg

confirmed that Barrilleaux appeared to be clinically depressed, exhibiting a high number of the

criteria for a diagnosis of major depression, including depressed mood for most every day,

diminished interest and general anhedonia, insomnia, fatigue, feelings of worthlessness, and

diminished ability to concentrate and attend. (Tr. 147).

On March 29, 2002, Dr. Degeyter confirmed that he believed Barrilleaux has major

depression due to her constant pain. He further reported that he believes that her work-related

physical activity has been compromised by her low back injury, multiple complex medical

problems, and depression, although he deferred to Dr. Friedberg's opinion regarding her ability
to work. (Tr. 150).

**B.      Back Problem Not Disabling**

As an initial matter, the undersigned concludes that Barrilleaux's back problems are not

disabling. The record shows that Barrilleaux has only mild degenerative disc disease, and no

examining physician has stated that the condition precludes Barrilleaux from working. Although

Dr. Cobb reported that Barrilleaux's back problems make her a candidate for a discography, both

Drs. Lea and Bernard opined that she does not need surgery. Dr. Bernard reported that

Barrilleaux showed no signs of significant disc space narrowing, significant herniation or

bulging, or canal or foraminal narrowing, calling her situation very "benign" and recommending

no further treatment. (Tr. 196). Dr. Lea confirmed this, reporting that, although Barrilleaux may

have some degree of continuing back pain, "she should be able to stand, sit, or walk with

moderately good success." (Tr. 191). Finally, Dr. Heitkamp reported that Barrilleaux is limited

only from squatting, crawling, creeping, frequent bending, and climbing ladders, and cannot lift

anything over 20 pounds except on an occasional basis. (Tr. 154). These limitations would not

appear to prevent Barrilleaux from performing jobs that do not require these activities, including

her past jobs of parking attendant and hospital admissions clerk. Thus, to the extent that

Barrilleaux alleges that she cannot work because of back problems, such arguments are without

merit.

**C.      Issue One: Residual Functional Capacity and Past Relevant Work**

The ALJ concluded that Barrilleaux has "past relevant" work as a car valet (parking

attendant), card dealer, hospital admissions clerk, and airline reservation clerk. (Tr. 21). The

ALJ further concluded that, although her thumb impairment precludes Barrilleaux's return to her past work as a card dealer (because it requires constant fingering), she can return to the remaining three jobs and perform them either as they are performed in the national economy or as she actually performed them in the past. (Id.). Barrilleaux contends that because two of these jobs – parking valet and hospital admissions clerk – were not performed at the "substantial gainful activity" level, these jobs cannot constitute past relevant work. She further contends that the findings of Dr. Heitkamp and Dr. Lea show that she does not have the residual functional capacity to return to these jobs. Barrilleaux also contends that she did not work as an airline reservation clerk for a long enough period of time for the job to be considered past relevant work.

The Regulations define "past relevant work" as follows:

> Work experience means skills and abilities you have acquired through work you have done which show the type of work you may be expected to do. . . . *We consider that your work experience applies [is relevant] when it was done within the last 15 years, lasted long enough for you to learn to do it, and was substantial gainful activity.*

20 C.F.R. §404.1565(a) (2004) (emphasis added); see also SSR 82-62 (1982); cited in Kindle v. Barnhart, 2005 WL 588241, *2 (E.D.Tex.2005).

### *Airline Reservation Clerk*

The undersigned agrees with the claimant that the job of airline reservation admissions clerk was not performed for a long enough period of time or for sufficient earnings to be considered substantial gainful activity. The ALJ appeared to acknowledge this during an exchange with both Barrilleaux and the vocational expert at the administrative hearing:

ALJ: Okay. The Continental Airlines shows earnings of about $2,100. Is that about the only time that you – was it full-time or part-time?

| Barrilleaux: | I was – they started you out as you just worked so many hours, so I only worked so many hours a week. |
| ALJ: | Did you work very long? |
| Barrilleaux: | Three months I think. |
| ALJ: | Okay. I don't think that was work to the level of being substantial gainful activity to be concerned with profiling that. |
| Vocational Expert: | Yes, sir. |

(Tr. 342). Therefore, the undersigned concludes that there is no substantial evidence in the record to support the ALJ's finding that Barrilleaux's prior work as an airline reservation clerk qualifies as "past relevant work" for purposes of a disability determination.

### *Parking Attendant*

The undersigned concludes that Barrilleaux's argument that she cannot return to her past relevant work as a parking attendant is without merit. It is well-settled that in determining whether a claimant can perform past relevant work, the ALJ may consider the functional demands of the job either as generally performed in the national economy or as actually performed by the claimant. Social Security Ruling (SSR) 82-61.[2] An ALJ may also rely on the Dictionary of Occupational Titles ("DOT") to define the job as it is usually performed in the national economy. Id.

The DOT defines the job duties of "car valet" or "parking attendant" as follows:

Parks automobiles for customers in parking lot or storage garage: Places numbered tag on windshield of automobile to be parked and hands customer similar tag to be used later in locating parked automobile. Records time and drives automobile to parking space, or points out parking space for customer's use.

---

[2] Social Security Rulings are issued by the Social Security Administration and are based on case decisions made at the administrative levels of adjudication, federal court decisions, Commissioner's decisions, opinions of the Office of the General Counsel, and other policy interpretations of the law and regulations. Although Social Security Rulings do not have the force and effect of the law or regulations, they are binding on all components of the Social Security Administration, in accordance with Section 422.406(b)(1) of the Social Security Regulations No. 22 (20 CFR Part 422), and are to be relied upon as precedents in adjudicating other cases.

> Patrols area to prevent thefts from parked automobiles. Collects parking fee from customer, based on charges for time automobile is parked. Takes numbered tag from customer, locates automobile, and surrenders it to customer, or directs customer to parked automobile. May service automobiles with gasoline, oil, and water. When parking automobiles in storage garage, may be designated Storage-Garage Attendant (automotive ser.). May direct customers to parking spaces

DICOT 915.473-010. The DOT further describes the job as "light work" with the following exertional levels:

> Exerting up to 20 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or up to 10 pounds of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) and/or a negligible amount of force constantly (Constantly: activity or condition exists 2/3 or more of the time) to move objects. Physical demand requirements are in excess of those for Sedentary Work.

Id.

The record shows that, after her 1998 injury to her left thumb, Barrilleaux's employer made a special accommodation for her by allowing her to work a temporary, modified parking attendant job. The record shows that Barrilleaux did not actually park cars, bur rather took keys from customers and made the tickets for those who did the actual parking. The ALJ concluded that Barrilleaux can return to this past work, because it requires frequent, but not constant, fingering. In so concluding, the ALJ noted that Barrilleaux has the full use of all of her digits, other than her right thumb, which is only marginally limited. This finding is consistent with the medical evidence in the record. Dr. Heitkamp, the only doctor to examine Barrilleaux's right hand after her December 2001 surgery, reported that Barrilleaux is limited from using her right hand for any type of grip or strength because of minimal strength, but has most of her dexterity in that hand. She therefore would not be precluded from performing the parking attendant job as she performed it, nor would she be precluded from performing this job as it is performed in the

national economy. The VE testified that such jobs are not physically demanding and are

considered light work, while the DOT states that this job does not require lifting more than 20

pounds occasionally, which is consistent with the lifting limitations that Dr. Heitkamp reported.

Considering the foregoing, the undersigned concludes that the claimant's argument that she

cannot return to her past work as a parking attendant is without merit.

### *Hospital Admissions Clerk*

Similarly, the undersigned concludes that Barrilleaux's argument that she cannot return to

her past work as a hospital admissions clerk is without merit. The DOT defines the job duties of

a "hospital admitting clerk" as follows:

> Interviews incoming patient or representative and enters information required for
> admission into computer: Interviews patient or representative to obtain and record
> name, address, age, religion, persons to notify in case of emergency, attending
> physician, and individual or insurance company responsible for payment of bill.
> Explains hospital regulations, such as visiting hours, payment of accounts, and
> schedule of charges. Escorts patient or arranges for escort to assigned room or
> ward. Enters patient admitting information into computer and routes printed copy
> to designated department. Obtains signed statement from patient to protect
> hospital's interests. May assign patient to room or ward. May compile data for
> occupancy and census records. May store patient's valuables. May receive
> payments on account.

DICOT 205.362-018. The DOT further describes the job as "sedentary work" with the following

exertional levels:

> Exerting up to 10 pounds of force occasionally (Occasionally: activity or
> condition exists up to 1/3 of the time) and/or a negligible amount of force
> frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) to
> lift, carry, push, pull, or otherwise move objects, including the human body.

Id.

Barrilleaux argues primarily that she cannot perform this job because it requires a

claimant to "enter[] information required for admission into [a] computer," which she claims she

cannot do because of her right thumb impairment. However, review of the job duties for a hospital admissions clerk shows that data entry is only one of *many* duties associated with this job, the majority of which Barrilleaux has the capacity to perform. In fact, none of the duties of this job, except the data entry duty, require the worker to use constant fingering or have maximum grip strength in their hands. Considering the foregoing, the undersigned concludes that there is substantial evidence supporting the ALJ's conclusion that Barrilleaux can return to her past work as a hospital admissions clerk.

**D.      Issue Two: Mental Impairments**

The Commissioner utilizes a corollary sequential procedure for determining the merits of mental disability claims. Essentially, this procedure substitutes specialized rules at Step 2 for determining whether mental impairments are severe, and also provides detailed guidelines for making Step 3 determinations as to whether mental impairments meet or exceed severity of mental impairments contained in the Listings, as follows:

1.      The ALJ must first evaluate the claimant's pertinent symptoms, signs, and laboratory findings to determine whether he or she has a medically determinable mental impairment. Serrano-Diaz v. Barnhart, 2004 WL 2431693, *6 (E.D.Pa. 2004),[3] citing 20 C.F.R. §404.1520a(b)(1).

2.      If a medically determinable mental impairment is found, the ALJ must then rate the degree of functional limitation resulting from the impairment. Serrano-Diaz v. Barnhart, 2004 WL 2431693, *6 (E.D.Pa. 2004), citing 20 C.F.R. §404.1520a(b)(2). To perform this latter step, the ALJ should assess the claimant's degree of functional limitation in four areas: (1) activities of daily living; (2) social functioning; (3) persistence or pace of concentration; and (4)

---

[3] The undersigned was unable to find any Fifth Circuit cases setting forth the proper procedure for analyzing mental disability claims since the revisions and amendments to 20 C.F.R. §404.1520a in 2000. The revisions and amendments became effective on September 20, 2000. 65 Fed. Reg. 50,746 (August 21, 2000). See Boyd v. Apfel, 239 F.3d 698, 705 n.11 (5th Cir. 2001). The Serrano-Diaz decision is therefore cited as the most succinct summary of the current law that the undersigned was able to find during research for this report and recommendation.

episodes of decompensation. See C.F.R. §404.1520a(c)(3). If the degree of limitation in the first three functional areas is "none" or "mild," and "none" in the fourth area, the ALJ will generally conclude that the impairment is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in the claimant's ability to do basic work activities. Serrano-Diaz v. Barnhart, 2004 WL 2431693, *6 (E.D.Pa. 2004), citing 20 C.F.R. §404.1520a(d)(1).

3.      When a severe mental impairment is found, the Commissioner determines whether the impairment meets or exceeds the requirements of the Listings. Serrano-Diaz v. Barnhart, 2004 WL 2431693, *6 (E.D.Pa. 2004), citing 20 C.F.R. §404.1520a(d)(2) (2002).

4.      When the severe mental impairment does not meet Listing requirements, the Commissioner then assesses the claimant's residual functional capacity. Serrano-Diaz v. Barnhart, 2004 WL 2431693, *6 (E.D.Pa. 2004), citing 20 C.F.R. §404.1520a(d)(3) (2002).

The procedure states that if the degree of limitation in the first three functional areas is "none" or "mild," and "none" in the fourth area, the ALJ will generally conclude that the impairment is not severe, *unless the evidence otherwise indicates that there is more than a minimal limitation in the claimant's ability to do basic work activities.* Serrano-Diaz v. Barnhart, 2004 WL 2431693, *6 (E.D.Pa. 2004), citing 20 C.F.R. §404.1520a(d)(1). In the Fifth Circuit, courts adhere to the standard set forth in Stone v. Heckler, 752 F.2d 1099 (5th Cir.1985) in assessing severity of an impairment. In Stone, the Fifth Circuit declared that severity of an impairment must always be determined with regard to an individual's *ability to perform substantial gainful employment,* and cannot be based on medical severity alone. Moreover, the Fifth Circuit articulated the correct severity standard as:

[A]n impairment can be considered as not severe only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience.

Stone, 752 F.2d at 1101. The court further stated that "[W]e will in the future assume that the ALJ and Appeals Council have applied an incorrect standard to the severity requirement unless the correct standard is set forth by reference to this opinion or another of the same effect, or by an express statement that the construction we give to 20 C.F.R. § 404.1520(c) (1984) is used." Id. at 1106.

In this case, the record shows that the ALJ did not properly apply the mental impairment analysis mandated by the Regulations. Although the ALJ did evaluate several of the required steps in the analysis, he essentially assessed Barrilleaux's claim of depression exclusively under Listings 12.04 and 12.06, without regard to the sequence of steps called for in 20 C.F.R. §404.1520a. Not only did this lead to an analysis of unnecessary portions of Listing 12.04,[4] it resulted in the ALJ's failure to assess the impact of Barrilleaux's depression on her residual functional capacity for work.

The ALJ determined that Barrilleaux has the medically determinable impairment of depression. In assessing Barrilleaux's degree of functional limitation in the four designated areas, he determined that she has only mild limitations in her activities of daily living and social functioning, and concentration, persistence, and pace, with no episodes of decompensation in work or work-like situations. (Tr. 17-18). Thus, the ALJ concluded that Barrilleaux's depression is not severe. However, the record shows that the ALJ did not utilize the correct standard for "severity" of impairments as required by Stone v. Heckler. Although the ALJ properly considered the record in finding Barrilleaux's limitations mild in three of the four

---

[4] For example, once the ALJ concluded that Barrilleaux's limitations of functioning in the four spheres was mild, there was no need to further evaluate Subsection "C" under Listing 12.04. Rather, pursuant to 20 C.F.R. §404.1520a, the analysis skips immediately to an assessment of the claimant's residual functional capacity.

spheres, such a conclusion does not end the inquiry, as the Fifth Circuit has mandated that severity of an impairment must always be determined with regard to an individual's *ability to perform substantial gainful employment.* The undersigned concludes that the ALJ failed to develop the record with respect to this issue. Indeed, although Dr. Degeyter opined that Barrilleaux has major depression, he deferred to Dr. Friedberg on the issue of whether such depression precludes Barrilleaux from working. Dr. Friedberg, in turn, did not address this issue, and neither did Dr.Heitkamp. Thus, the record contains no evidence supporting the ALJ's conclusion that Barrilleaux's depression is not so severe that it precludes her from working, and further development of the record is necessary on this point before a disability determination may be made.

Considering the foregoing, the undersigned concludes that remand is appropriate this matter. See Ferguson v. Schweiker, 641 F.2d 243, 250, n. 8 (5th Cir.1981) (remand is appropriate upon a showing of "good cause," which includes an "inability to make a definitive ruling concerning a claimant's disability based on the record before the court.").

### *Conclusion*

Considering the foregoing, the ALJ's decision is **REVERSED AND REMANDED** for further proceedings in accordance with these findings. On remand, the ALJ shall order a consultative examination to fully assess whether Barrilleaux's depression is so severe that she is precluded from engaging in substantial gainful employment.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and Fed.R.Civ.P. 72(b), the parties have ten (10) days from receipt of this Report and Recommendation to file specific, written objections

with the Clerk of Court. Counsel are directed to furnish a courtesy copy of any objections or responses to the district judge at the time of filing.

Inasmuch as the remand recommended herein falls under sentence four of Section 405(g), any judgment entered in connection herewith will be a "final judgment" for purposes of the Equal Access to Justice Act (EAJA). See, Richard v. Sullivan, 955 F.2d 354 (5th Cir. 1992) and Shalala v. Schaefer, 509 U.S. 292 (1993).

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within ten (10) days following the date of receipt, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error. See Douglass v. United Services Automobile Association, 79 F.3d 1415 (5th Cir. 1996).**

Signed at Lafayette, Louisiana on August 29th, 2005.

COPY SENT
DATE 8-29-05
BY CM
TO MtM
TLM | t∫

Mildred E. Methvin
United States Magistrate Judge
800 Lafayette St., Suite 3500
Lafayette, Louisiana 70501
(337) 593-5140 (phone) 593-5155 (fax)